UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

STEVEN S. ZINTMAN,

                Petitioner,

v.

CONNIE HORTON,

                Respondent.

_____/

Case No. 2:20-cv-41

Honorable Janet T. Neff

## **OPINION**

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Discussion

### I.      Factual allegations

Petitioner Steven S. Zintman is incarcerated with the Michigan Department of Corrections at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.  Following a four-day jury trial in the Marquette County Circuit Court, Petitioner was convicted of first-degree arson, Mich. Comp. Laws § 750.72, and first-degree felony murder, Mich. Comp. Laws § 750.316b.  On August 9, 2016, the court sentenced Petitioner to 30 to 70 years' imprisonment on the arson conviction and life imprisonment on the murder conviction.

On March 25, 2020, Petitioner filed his habeas corpus application.  Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court.  *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  Petitioner signed his application on March 25, 2020 (Pet., ECF No. 1-1, PageID.94), and the petition was postmarked on March 27, 2020 (Pet., ECF No. 1-1, PageID.90.)  The petition was received by the Court on April 1, 2020.  The date on which a prisoner signs the petition is deemed under Sixth Circuit law to be the date of handing to officials.  *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006), *Bomer v. Bass*, 76 F. App'x 62, 63 (6th Cir. 2003) (order); *Towns v. United States*, 190 F.3d 468, 469 (6th Cir. 1999) (order)).  The Court therefore has given Petitioner the benefit of the earliest possible filing date.

Petitioner raises the following three grounds for relief in his habeas application:

I.      [PETITIONER'S] FIRST DEGREE FELONY MURDER CONVICTION MUST BE REVERSED AS THE PROSECUTION PRESENTED CONSTITUTIONALLY INSUFFICIENT EVIDENCE OF THE REQUISITE ELEMENTS OF FIRST DEGREE ARSON.

II.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED [PETITIONER'S] PRETRIAL MOTION TO SUPPRESS EVIDENCE OF PRIOR ACTS OF DOMESTIC VIOLENCE REGARDING HIS EX-WIFE, INCLUDING THAT HE HAD

PHYSICALLY ASSAULTED HER, THREATENED TO KILL HER NUMEROUS TIMES, THREATENED HER WITH A STICK WHICH HE LABELED HIS "BITCH BEATER," KILLED HER DOG, AND HAD BEEN CONVICTED OF MISDEMEANORS INVOLVING DOMESTIC VIOLENCE. THERE WAS ABSOLUTELY NO EVIDENCE ALLEGED OR INTRODUCED THAT [PETITIONER] HAD ENGAGED IN ANY UNTOWARD CONDUCT AGAINST THE DECEASED, HIS GIRLFRIEND OF 18 MONTHS. THIS HIGHLY PREJUDIC[I]AL TESTIMONY GREATLY OUTWEIGHED ANY PROBATIVE VALUE IT MAY HAVE HAD AND WAS REVERSIBLE ERROR.

III.     THE TRIAL COURT ERRED WHEN IT RULED THAT [PETITIONER] WAS NOT IN "CUSTODIAL DETENTION" WHEN HE MADE AN INCRIMINATING STATEMENT DURING A POLYGRAPH EXAMINATION THAT WAS NOT AUDIOVISUALLY RECORDED, CONTRARY TO LAW. UNDER THE "TOTALITY OF THE CIRCUMSTANCES" TEST OF MCL 763.7a, A REASONABLE PERSON WOULD NOT HAVE BELIEVED THAT HE WAS FREE TO LEAVE THE POLICE-STATIONHOUSE ENVIRONMENT. TRIAL COUNSEL WAS THEREFORE INEFFECTIVE FOR NOT ASKING THE COURT TO INSTRUCT THE JURY, AS PROVIDED BY MCL 763.9, THAT SUCH RECORDINGS ARE REQUIRED BY LAW AND THAT THE JURY MIGHT CONSIDER THE ABSENCE OF ONE IN EVALUATING THE EVIDENCE RELATING TO THE STATEMENT. THE TRIAL COURT REVERSIBLY ERRED WHEN IT DENIED [PETITIONER'S] MOTION FOR NEW TRIAL AT THE CONCLUSION OF THE *GINTHER* HEARING.

(Pet., ECF No. 1, PageID.2.)

The facts underlying the convictions were exhaustively recounted by the Michigan

Court of Appeals, as follows:

This case arises from the death of defendant's girlfriend, Sally Plume, during a fire at defendant's residence in the early morning hours of May 4, 2014. The residence is a two-unit duplex owned by defendant and defendant's son and daughter-in-law, Daniel and Heather Zintman. At the time of the fire, defendant and Plume lived in one unit of the duplex, while Daniel and Heather lived in the other unit with their two minor children. The fire occurred in defendant's unit in the master bedroom shared by defendant and Plume.

Very early that morning, Heather woke Daniel when she noticed smoke in their unit of the duplex. Daniel investigated the source of the smoke and determined that it was coming from defendant's unit. Daniel told Heather to call 911, then went outside and banged on the door of defendant's unit. When he heard defendant's voice, he opened the door and realized that defendant's unit was filled

with smoke.  Defendant was standing in the kitchen and holding onto the kitchen counter; defendant's face appeared purple in color and he was taking deep breaths. Daniel testified that defendant is an alcoholic and is almost always intoxicated.  He urged defendant to leave the unit, but because he smelled alcohol on defendant he determined that defendant would probably be uncooperative.  Daniel therefore knocked defendant down and dragged him from the unit.  Daniel testified that defendant did, in fact, resist his efforts to drag him from the unit.  During this struggle, Daniel asked defendant if he was trying to kill himself, and defendant replied that it was "a good day to die."

Daniel succeeded in dragging defendant from the unit, then asked him whether Plume was in the unit.  At first, defendant did not respond, but eventually he told Daniel that Plume was not home and had gone somewhere with a friend. Daniel then went back to his unit and verified that Heather, their two children, and their pets were out of the duplex.

The first emergency personnel to arrive was Steven Tighe, a paramedic with Forsyth Township EMS.  Tighe testified that when he arrived at the home, he spoke with defendant to ascertain if he was hurt and observed that defendant appeared to be intoxicated.  When he asked defendant if anyone else was in the house, defendant did not respond.  After further questioning by Tighe and Daniel, defendant said that Plume was in the back bedroom, passed out on the bed.  Tighe testified that from the time he first asked defendant if anyone was in the unit until the time defendant stated that Plume was in the house was "a few minutes."  Daniel and Tighe got a ladder and looked in the bedroom window where they observed both smoke and fire in the room.  By this time, additional rescue personnel had arrived and they located Plume's body in the bedroom.  Plume was dead, and was partially on the bed and partially on the floor, in a kneeling position.

The medical examiner, George Krzymowski, testified that the cause of Plume's death was asphyxia by smoke inhalation, and that Plume had been alive when the fire started.  He further testified that Plume's blood alcohol level was 0.272; Krzymowski testified that 0.3 could be considered a medical emergency and described Plume as having been "very intoxicated."  He further testified that there was citalopram in Plume's system, which Krzymowski testified is an antidepressant.

Sergeant William Smith, fire investigator with the Michigan State Police, testified that the origin of the fire was the mattress, and that there was no evidence of an accelerant.  Smith testified that the fire did not originate with either the electrical or gas service, as both were shut off.  Smith concluded that the fire was of human origin, but it was not possible to determine whether it had been started accidentally or intentionally.  Smith testified that the fire could have been started by a lighter or a cigarette, but there was no evidence that either item was used to start the fire.  Smith also testified that at the scene of the fire, on the floor of the bedroom on the side of the bed where defendant indicated he had been sleeping, investigators found an item that later testimony revealed to be a wooden dowel rod

that defendant had labeled with the words "b**ch beater." An ashtray was also found near the bed.

Sergeant Adam Lafave with the Forsyth Township Police Department testified that at the scene of the fire, he spoke with defendant twice. The first time, Lafave asked defendant what had happened and defendant responded that he had blanked out and did not remember. Defendant then told Lafave that he had been in the bedroom with Plume when the fire started. Lafave testified that defendant appeared to be intoxicated, had difficulty standing, and was mumbling.

Later that morning, while still at the scene of the fire, Lafave questioned defendant again. This time, defendant told Lafave that he had been in the kitchen when the fire started. In response to questioning, defendant told Lafave that he and Plume had spent the day "monkeying around" the house, "putting up foam," and drinking alcohol. Defendant stated that Plume had become so intoxicated that he had had to drag her to bed. Defendant also stated that someone named "Jim" had been at the unit that day, but defendant could give no further information about that person. Lafave questioned defendant about why initially he had refused to leave the house when Daniel tried to help him. At first, defendant stated that he didn't know why, but later defendant stated that it was because his house was his sanctuary and also that he does stupid things when he is drunk.

Lafave testified that while talking with defendant at the time of the fire, defendant's clothes had a black, charred substance on them that defendant claimed had been dripping from the ceiling fan, which Lafave understood to mean the bedroom ceiling fan. Lafave asked defendant how that came to be on his clothing if he had not left the kitchen, and defendant responded that he didn't know. Lafave testified that when searching the kitchen after the fire, the officers discovered a smoke detector on the kitchen counter with a hat over it; the battery of the smoke detector had been partially removed so that the leads did not connect with the smoke detector, making the smoke detector inoperative.

Officer Kristi Uren with the Forsyth Township Police Department testified that defendant was taken to the hospital, where she informed him that Plume had died. Defendant became very upset and began to cry. Uren testified that defendant then asked her if it was possible that an accelerant had been placed on the window, and also asked her whether Plume's ex-boyfriend had started the fire.

Three weeks after the fire, Lafave interviewed defendant a third time, this time at the police station. During this interview, defendant told Lafave that on the day leading up to the fire, someone named Paul had been at the unit with a "half gallon" of alcohol and that the three of them had been drinking. When Lafave questioned him about Paul, defendant changed the name of the person to Bob, but could not provide any other information about Bob. Defendant stated that Plume had become so intoxicated that he put her in bed, and then joined her in bed after Bob left. Later, he awoke to flames. Defendant told Lafave that he could not lift Plume, so he went outside and got himself wet, then went back into the unit, but

Daniel dragged him from the house before he could go upstairs to attempt to rescue Plume.  Defendant explained to Lafave that he said it was a good day to die because he thought he would die if he went back upstairs to the bedroom. Lafave testified that during this interview defendant suggested that Plume started the fire by flicking a cigarette onto the comforter.   Defendant denied Lafave's suggestion that defendant and Plume had a suicide pact or that he had a plan to kill Plume.

About one month later, Lafave and Detective Christopher MacMaster of the Michigan State Police interviewed defendant a fourth time.  MacMaster testified that at the beginning of the interview, which lasted five to seven hours, defendant asserted that he did not remember what had happened the night of the fire. Defendant told MacMaster that on the day of the fire, he and Plume and a man named Scott had been drinking at the unit during the day; defendant could provide no further details about Scott.  Defendant stated that eventually Plume was very intoxicated and he carried her upstairs and put her in bed, then fell asleep.  He stated that he awoke to flames in the bedroom, then tried to wake Plume.  After failing to wake Plume, he took the cat and went outside to find water to douse himself.  While outside he met his son, then reentered the house and tried to go upstairs but could not because of the smoke and fire.

Later in the interview, defendant stated that on the morning of the fire he had been in bed with the sleeping Plume and was looking for cigarettes under the mattress, using the lighter as a light, when he accidentally ignited the fabric hanging down from the mattress.  Upon further questioning by MacMaster, defendant stated that he started the fire while playing with a cigarette that accidentally lit some white lace on the bed on fire.  Defendant stated that he thought he had put the fire out, then went to sleep, but later awoke to flames.  When asked repeatedly during the interview whether he set the fire, defendant eventually replied that "I gave myself a birthday present and set my girlfriend on fire."   MacMaster testified that defendant was smiling when he made the statement.   Defendant confirmed to MacMaster that the night of the fire was his birthday.  After telling this information to MacMaster, defendant stated[,] "I'm going to prison, I'm going to f***ing prison."   When MacMaster asked defendant some written questions, including whether defendant thought he had been fairly treated during the interview, defendant's written response was[,] "Yes.  Where['s] the rope."

Katie Thibeau, a neighbor of defendant, testified that she spoke with defendant when he was discharged from the hospital a few weeks after the fire.  She testified that she went to his duplex to offer her condolences regarding Plume, and that he had wanted to show her the bedroom where the fire occurred.  She testified that defendant pointed to a pile of clothes as the spot where the fire had started, claiming that Plume had dropped a cigarette there and started the fire.  He told her that he had thrown the cat out the window to save it and had tried to drag Plume out the window, but was unable to.  His demeanor when telling this story was very matter of fact, according to Thibeau.  He also referred to Plume as "Sarah" instead of Sally.  In the following weeks, defendant told Thibeau various versions of what had occurred.  One version was that the cat had tipped over a candle in the room,

6

starting the fire.  On another occasion he told her that a heater started the fire; when she reminded him that it was her heater that he had borrowed and that he had returned it before the fire, defendant changed the story stating that a lantern tipped over and started the fire.

In August, 2014, more than three months after the fire, Thibeau was listening to defendant talk about the fire and she asked him why he could not just tell the truth that he had lit his girlfriend on fire and watched her burn, to which defendant replied[,] "Well, I didn't watch her burn."  Thibeau testified that defendant made this statement in a matter of fact manner without emotion, and that he was highly intoxicated at the time.  Thibeau further testified that within one to two weeks of defendant returning to his home after the fire, she saw defendant with a new girlfriend.

Defendant's ex-wife, Leila-Marhi Black, testified that she had met defendant on a dating website, dated him for two years, and then was married to him for two years before leaving him in November 2013.  She testified that defendant is an alcoholic and that while married to him defendant typically drank straight vodka from the time he awoke until he passed out.  She testified that he would throw pop bottles and pop cans at her and dump pop on her head.  He also had a stick made from a dowel from the closet; he had drilled a hole in the dowel and had put a rope through it and had written "b**ch stick" or "b**ch beater" on it.  She testified that he told her that he kept it by his bedside when he slept because he thought she would attack him while he was unconscious.  Black identified the stick as the object in the photograph of the bedroom taken after the fire.  She testified that he never hit her with the stick, but that he had brandished it at her, and also that he had pushed and shoved her.  Black further testified that defendant once told her that "one of these days you're not going to wake up" or "one of these days they're not going to find you," which she understood to mean that he would kill her in her sleep.

Black testified that while she was married to defendant she got a small dog named Lucy, and that Lucy and defendant did not like each other.  Black testified that one day when she was drunk and had passed out, she thought she heard Lucy whining.  Defendant came into the bedroom and she asked him if he had let Lucy out, to which defendant replied[,] "Lucy is no longer with us."  When Black questioned him, he said that the dog had urinated on the floor, so he had rubbed her nose in it and that the dog's neck had snapped and she had started bleeding, and so he buried her out back.  Black testified that she did not believe defendant and went back to sleep.  Later when she awoke and looked for the dog, he told her that he had physically kicked Lucy out the door and she had flown over the truck, and had never come back.  Black then observed that there was blood and urine on the living room floor.  Lucy never returned, and Black moved out the next day and later divorced defendant.

Black also testified that defendant believed that his son, Daniel, wanted the entire duplex and that defendant told her that he would burn the duplex down before

he would let his son take his half.  She further testified that defendant burned pages that he had torn from her journal and had also burned pictures of her children.  She also testified that May 3 is defendant's birthday and that defendant typically would become upset if his family did not acknowledge his birthday.

Black testified that after defendant was arrested, she visited him in jail because she wanted to ascertain if he had intentionally set the fire.  She testified that defendant told her that he thought the fire started from a candle, but otherwise was reluctant to talk about the fire.  She further testified that defendant suggested that they get back together once he was released.

Dr. Bruce Harvey, an emergency room physician, was called by the defense and testified that both chronic alcoholism and carbon monoxide poisoning can cause memory blackouts and confabulation.  Dr. Harvey also testified that defendant's blood test indicated that defendant was very intoxicated on the night of the fire and also had high levels of carbon monoxide.  On rebuttal, Black testified that during the four years that she was in a relationship with defendant, she never observed him having memory problems or blackouts.  Daniel, too, testified on rebuttal that before the fire he had never observed defendant having memory loss, but that he had observed defendant rearrange details of a story to improve his own role.

At the conclusion of trial, the jury found defendant guilty of first-degree arson and first-degree felony murder.  The trial court sentenced defendant to life without possibility of parole for the murder conviction, and to life imprisonment for the arson conviction.  Upon defendant's motion, the trial court resentenced defendant on the arson conviction to 30 to 70 years' imprisonment.

*People v. Zintman*, No. 334574, 2018 WL 3551381, at \*1-5 (Mich. Ct. App. July 24, 2018).

The trial court initially sentenced Petitioner on November 24, 2016, to life imprisonment on both offenses.  Petitioner filed a notice of appeal, and appellate counsel was appointed.  Petitioner, through appellate counsel, filed a motion to correct an invalid sentence.  The court granted the motion on June 21, 2016, and, on August 9, 2016, the court imposed the sentences earlier recited.

Petitioner filed a new claim of appeal from the corrected sentences.  On September 30, 2016, the parties filed a stipulation to dismiss the first appeal.  On November 22, 2016, Petitioner filed a motion for new trial in the Marquette County Circuit Court, asserting that the trial attorneys were constitutionally ineffective in failing to seek an instruction under Mich. Comp.

Laws § 763.9 and requesting an evidentiary hearing on counsels' effectiveness, pursuant to *People v. Ginther*, 212 N.W.2d 922 (1973).  A *Ginther* hearing was held on June 12, 2017.  In an order and opinion issued on August 24, 2017, the trial court denied the motion for new trial.

On appeal, in the brief filed by appellate counsel, Petitioner raised the same three grounds presented in his habeas petition.  In a pro per supplemental brief, Petitioner raised two additional claims of ineffective assistance of counsel and argued that the trial court had erred in permitting witnesses Daniel Zintman and Marhi Black to be recalled to testify in rebuttal, after they had been present in the courtroom following their testimony in the case in chief.  In a lengthy and comprehensive unpublished opinion issued on July 24, 2018, the court of appeals rejected all appellate grounds and affirmed the convictions.  *Zintman*, 2018 WL 3551381, at *13.

Petitioner sought leave to appeal to the Michigan Supreme Court, apparently raising the same grounds presented to the Michigan Court of Appeals.  The supreme court denied leave to appeal on February 4, 2019.  *People v. Zintman*, 922 N.W.2d 360 (Mich. 2019).

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 574 U.S. 1, 4 (2014); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here

the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## III.     Discussion

### A.     Ground I:  Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner argues that the evidence was insufficient to support his conviction for first-degree arson and therefore insufficient to support his felony-murder conviction.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine

11

the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In addressing Petitioner's claim, the Michigan Court of Appeals thoroughly discussed the direct and circumstantial evidence supporting the convictions:

> Defendant contends that the evidence was not sufficient to prove the essential elements of his arson conviction, which was the underlying felony for his first-degree felony murder conviction. We disagree.
>
> Every defendant has a due process right to have the charge against him or her proven by sufficient evidence. *People v Oros*, 320 Mich App 146, 152; 904 NW2d 209 (2017). Thus, to justify a guilty verdict, the prosecution is required to introduce sufficient evidence on each element of an offense. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). This Court reviews a challenge to the sufficiency of the evidence de novo to determine whether, viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to justify the conclusion of a rational trier of fact that the evidence proved the essential elements of the crime beyond a reasonable doubt. *People v Solloway*, 316 Mich App 174, 180-181; 891 NW2d 255 (2016).
>
> Circumstantial evidence and all reasonable inferences drawn from circumstantial evidence can constitute satisfactory proof of the crime. *Id.* This

Court defers to the determination of the trier of fact regarding what inferences may be drawn from the evidence presented, as well as the weight accorded to those inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Similarly, this Court will not disturb the trier of fact's credibility determinations. *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). Although the prosecution is required to prove the elements of the crime beyond a reasonable doubt, the prosecution is not required to disprove every reasonable theory consistent with the defendant's innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Defendant was convicted of first-degree felony murder, MCL 750.316(1)(b). To secure a conviction of that offense the prosecution must introduce evidence sufficient to prove that the defendant (1) killed a human being, (2) with the intent to kill, do great bodily harm, or create a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result (malice), and (3) the death occurred while the defendant was committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in the statute, including arson. *People v Bobby Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007).

As the predicate felony underlying the felony murder conviction, defendant was convicted of first-degree arson, MCL 750.72, which provides, in relevant part:

(1) A person who willfully or maliciously burns, damages, or destroys by fire or explosive any of the following or its contents is guilty of first-degree arson:

(a) A multiunit building or structure in which 1 or more units of the building are a dwelling, regardless of whether any of the units are occupied, unoccupied, or vacant at the time of the fire or explosion.

(b) Any building or structure or other real property if the fire or explosion results in physical injury to any individual. [MCL 750.72(1).]

Thus, to prove first-degree arson, the prosecution was obligated to show that defendant (1) willfully or maliciously, (2) burned, damaged, or destroyed by fire or explosive, either (3) a multiunit building or structure containing at least one dwelling unit, or (4) any building or structure resulting in physical injury to any individual. Here, there is no dispute that defendant's residence was burned and damaged by fire and that the residence was part of a multiunit building containing a dwelling. There is also no dispute that the fire resulted in Plume's death. And although defendant gave several inconsistent statements, he ultimately admitted to police that he set the fire, albeit accidentally. Thus, the only disputed element is whether defendant burned the residence "willfully or maliciously."

To prove that a defendant acted "willfully or maliciously" in the context of arson, the prosecution must demonstrate:

13

1) that the defendant intended to do the physical act constituting the actus reus of arson, i.e., starting a fire or doing an act that results in the starting of a fire (intentional arson); or 2) that the defendant intentionally committed an act that created a very high risk of burning a dwelling house, and that, while committing the act, the defendant knew of the risk and disregarded it (wanton arson). [*Nowack*, 462 Mich at 409.]

An actor's intent may be inferred from surrounding facts and circumstances. *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998). Moreover, given the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient. *Id.* In addition, inconsistent statements can be considered as indicating consciousness of guilt. *People v Unger*, 278 Mich App 210, 225-226; 749 NW2d 272 (2008).

In this case, the prosecution introduced sufficient evidence from which a jury could conclude that defendant, who admittedly set the fire, did so willfully or maliciously.

**1. Failure to reveal Plume's presence in the house.** At the scene of the fire, defendant at first failed to reveal that Plume was in the residence. When both Daniel and Tighe initially asked about Plume's location, defendant was silent. A few minutes later, defendant told Daniel that Plume was out with a friend. Upon repeated questioning, defendant revealed that Plume was in the residence. While this could be explained by confusion brought on by intoxication and carbon monoxide poisoning, it could also be considered an intentional act to delay Plume's rescue, which could be considered proof of his having intentionally set the fire for the purpose of killing her.

**2. Resisting Daniel's rescue efforts.** Daniel testified that when he tried to drag defendant from the house, defendant resisted his efforts. When Daniel asked him if he was trying to kill himself, he replied that it was "a good day to die." From this statement, the jury could conclude that defendant intentionally set the fire because he was suicidal.

**3. Inconsistent stories.** Defendant told numerous inconsistent stories about his location and actions on the morning of the fire. At the scene of the fire, defendant first told Officer Lafave that he blanked out and did not know what had happened, then told Lafave that he was in the bedroom when the fire started. A short time later, he told Lafave that he was in the kitchen when the fire started. When Lafave interviewed defendant three weeks later, defendant stated that he had been sleeping in the bedroom with Plume and awoke to flames, tried to drag Plume out but couldn't, went outside to get wet, then tried to return to rescue Plume but was dragged from the house by Daniel. During this interview defendant suggested that Plume started the fire by flicking a cigarette onto the comforter. When defendant was interviewed a fourth time one month later, defendant stated that he had been in bed with the sleeping Plume and was looking for cigarettes under the mattress, using the lighter as a light, when he accidentally ignited the fabric hanging

down from the mattress.  In that same interview, he also stated that he accidentally started the fire when his cigarette ignited some lace on the comforter, and that he thought that he put the fire out, but later awoke to flames.

Thibeau, defendant's neighbor, testified that he also told her conflicting accounts after the fire.  First, he told her that Plume had started the fire by dropping a cigarette on a pile of clothing, and that he had tried to drag Plume out the window.  Later, he told Thibeau that the cat had tipped over a candle in the room, starting the fire.  On another occasion he told her that a heater started the fire; when she reminded him that he had returned the heater to her before the fire, defendant changed the story stating that a lantern tipped over and started the fire.  The jury could have inferred from the inconsistent statements that defendant was trying to conceal his guilt.

Defendant also reported that during the day before the fire, another man had joined defendant and Plume in drinking. Defendant told Lafave that this man was named Jim.  Later, defendant told Lafave during the third interview that the man was named Paul.  When Lafave questioned him further, defendant said the man was named Bob.  During the fourth interview, defendant told MacMaster that the man was named Scott.  Defendant could not provide any further information about this man.  The jury could have inferred that these inconsistent statements indicated that the other man was a fiction created by defendant to deflect suspicion from himself.

**4.  The disabled smoke detector.**  Daniel testified that when he entered defendant's unit on the morning of the fire, the unit was full of smoke and defendant was standing in the kitchen holding onto the kitchen counter.  When later searching the house, officers found on the kitchen counter a disabled smoke detector.  The smoke detector was covered with a hat.  The jury could have inferred from this that defendant had disabled the smoke detector, perhaps because the smoke detector alarm had gone off (or defendant feared that it would), and then concealed it with the hat.  Daniel's discovery of defendant in the kitchen next to the counter supports this inference.

**5.  Defendant's admissions.**  Defendant also made statements that could be considered admissions.  Detective MacMaster testified that during the fourth interview, defendant stated, while smiling:  "I gave myself a birthday present and set my girlfriend on fire."  Thibeau, defendant's neighbor, testified that three months after the fire she confronted him and asked him why he could not just tell the truth that he had lit his girlfriend on fire and watched her burn, to which defendant replied, "Well, I didn't watch her burn."  The jury could infer from these statements that defendant had intentionally set the fire that killed Plume.

Because a defendant's intent may be inferred from surrounding facts and circumstances, and because minimal circumstantial evidence is sufficient given the difficulty of proving an actor's state of mind, *Fetterley*, 229 Mich App at 517-518, the prosecution introduced sufficient evidence from which the jury could have concluded that defendant, who admittedly set the fire, did so willfully or

> maliciously.  The prosecution therefore introduced evidence sufficient to support the arson conviction, and therefore proved the predicate felony for the felony murder conviction.

*Zintman*, 2018 WL 3551381, at \*5-8.  Although the court of appeals cited only Michigan cases, the leading case cited, *People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992), expressly applies the *Jackson* standard.

As earlier discussed, the facts found by the court of appeals are entitled to a presumption of correctness in this Court, which Petitioner may overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S at 546.  Petitioner makes no attempt to dispute any fact recited by the court of appeals.  Instead, he merely outlines a separate version that highlights the facts most favorable to himself.  Crediting Petitioner's summary, however, would contravene *Jackson*, which requires that the Court consider the evidence in the light most favorable to the prosecution.  As a consequence, the state court's factual findings are accepted as true.

Moreover, the court of appeals, as required by *Jackson*, identified the elements of arson under state law.  It is the prerogative of the state to define the elements of the crime and that definition binds the federal courts.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson*, 443 U.S. at 324 n.16 ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses.  Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.").  As a consequence, this Court is bound by the state court's recitation of the elements of the offense of first-degree arson.

16

The court of appeals squarely applied the facts it found to each of the elements of the elements of the first-degree arson offense, as it was required to do under *Jackson*, 443 U.S. at 324 n.16.  The court recognized, however, that only one of the elements—whether Petitioner burned the residence willfully or maliciously—was contested at trial.  The court of appeals pointed to Petitioner's failure to reveal the victims presence in the house; his resistance to his son's efforts to rescue him; the many inconsistent stories he told to his son, the police, and his neighbor; the disconnection of the smoke detector and Petitioner's arguable attempt to conceal it; and his own admissions.

Admittedly, much of the evidence was circumstantial.  However, the Supreme Court has "never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).  "And juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" *Id.* (alteration in original) (quoting 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions: Criminal* § 12.04 (5th ed. 2000)).

The court of appeals, considering the entire record, held that the identified facts supported the reasonable inference that Petitioner had intentionally or willfully set the fire.  In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'"  *Id*. at 655.  The Court described a reasonable inference as an inference that a rational jury could make from the facts.  The inference need not be compelled by those facts; it must simply be rational.  *Id*. at 656.  As a result, to succeed in his challenge, Petitioner must show that the inference identified by the court of appeals is irrational.

Petitioner has not made that showing.  Certainly, the inference singled out by the court of appeals—that Petitioner intentionally set the fire—could rationally flow from the totality of the underlying facts.  His argument that other inferences might follow from the evidence—inferences that favor him—is immaterial.  Petitioner has not identified any United States Supreme Court case that resolves the issue differently on a set of materially indistinguishable facts. Moreover, he has failed to overcome the double deference owed to the state-court's application of the facts to the *Jackson* standard on habeas review.  *Tucker*, 541 F.3d at 656.  Accordingly, Petitioner is not entitled to habeas relief on his sufficiency-of-the-evidence claim.

**B.      Ground II:  Admission of Evidence of Other Acts of Domestic Violence**

In his second ground for relief, Petitioner argues that the testimony of his ex-wife, concerning his history of his domestic violence against her, was improperly admitted under Mich. Comp. Laws § 768.27b.  The statute states that,

> in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence for any purpose for which it is relevant, if it is not otherwise excluded under Michigan Rule of Evidence 403.

*Id.*  Petitioner argues that he was tried on the charge of first-degree arson, not domestic violence. He therefore contends that his ex-wife's testimony should not have been admitted.

After quoting in detail the statute and its associated definitions, the Michigan Court of Appeals held, as follows:

> The statute is intended to allow "prior bad acts" evidence of domestic violence to be admitted as long as the evidence satisfies the "more probative than prejudicial" requirement of MRE 403.  *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011).  The language of the statute permits a trial court to admit relevant evidence of other domestic assaults to prove any issue, including the defendant's character.  *Id.* at 609.  If the danger of unfair prejudice outweighs the probative value of the evidence, however, the trial court is obligated to exclude it. *People v Watkins*, 491 Mich 450, 484-486; 818 NW2d 296 (2012).

Defendant first argues that Black's testimony was improperly admitted because he was not charged with an offense involving domestic violence[2] as required for the admission of evidence of prior domestic violence under MCL 768.27b. The statute defines an offense involving domestic violence to mean an occurrence that causes or attempts to cause physical or mental harm to a family or household member. MCL 768.27b(5)(a)(i). A family or household member is defined by the statute to include individuals with whom the defendant resides or with whom the defendant has a dating relationship. MCL 768.27b(5)(b)(ii), (iv); *Railer*, 288 Mich App at 220 n 3. Here, defendant was accused of first-degree arson causing the death of Plume. Because the offense caused physical harm to Plume, defendant's girlfriend who resided with him, the arson was an "offense involving domestic violence" within the meaning of the statute.

Defendant also argues that the trial court erred by admitting the evidence of the prior domestic violence because the prior acts differ from the charged offense in this case. This Court, however, has held that prior acts of domestic violence are admissible under MCL 768.27b regardless of whether the acts are "identical to the charged offenses." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). Furthermore, the statute does not require that prior acts of domestic violence be similar in kind to the charged conduct to be admissible.

Defendant also argues that the evidence was not relevant, and that any relevance was outweighed by its prejudicial effect. Even when evidence is admissible under MCL 768.27b and is relevant under MRE 402, it may still warrant exclusion if it is unfairly prejudicial. *Watkins*, 491 Mich at 481. Only when unfair prejudice outweighs the probative value of evidence, meaning that "there is a danger that the evidence will be given undue or preemptive weight by the jury" or that it would be inequitable to admit the evidence, need the evidence be excluded. *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

Here, the prior acts of domestic abuse were relevant to show defendant's character and his propensity to commit acts of violence against his domestic partner. Black testified that defendant shoved and pushed her, and sometimes threatened that "one of these days you're not going to wake up" or "one of these days they're not going to find you," which she understood to mean that he would kill her in her sleep. He also told her that he had killed her dog while she slept; Black testified that because there was blood on the floor and the dog did not return, she believed that he had, in fact, killed the dog. She further testified that defendant burned pages that he had torn from her journal and had also burned pictures of her children, using fire to inflict the domestic violence (engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested). He also told her that he would burn down the duplex (where at that time she lived with defendant) to prevent his son from obtaining sole ownership of it. This evidence was relevant to show defendant's propensity to commit an act of domestic violence, see *Railer*, 288 Mich App at 219-220, and it permitted the jury to assess the charges in light of the bigger picture of defendant's behavioral history. See *Schultz*, 278

Mich App at 779.  Given that the disputed element at trial was whether defendant possessed the requisite intent for the arson conviction, Black's testimony regarding defendant's propensity to commit domestic violence was relevant.

The evidence also was not unfairly prejudicial. Given that MCL 768.27b allows evidence to be admitted for propensity purposes in cases of domestic violence, when balancing MRE 403 concerns, "courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect."  *Watkins*, 491 Mich at 487 (discussing the similar statute MCL 768.27a). Here, weighing the propensity value of the evidence in favor of admission, its value outweighed MRE 403 concerns.  See *People v Daniels*, 311 Mich App 257, 272; 874 NW2d 732 (2015) (evidence of previous domestic violence is admissible because the defendant's history governs the likelihood that defendant committed a given crime).  Considerations that may lead to exclusion of such evidence include dissimilarity between the other acts and the charged offense, temporal proximity, infrequency of the other acts, intervening acts, the lack of reliability of the other acts, and the lack of need for the other acts evidence.  *Watkins*, 491 Mich at 487-488 (discussing the similar statute MCL 768.27a).  Black's testimony in this case was similar in that it involved use of fire to threaten and intimidate a domestic partner, some of the violence occurred or was threatened to occur when the domestic partner was asleep, the other acts of domestic violence occurred within approximately 18 months of each other, and there was no indication that the other acts evidence was unreliable.  Further, Black's testimony was not particularly graphic or inflammatory and therefore was not likely to interfere with the jury's ability to logically weigh the evidence.  See *Railer*, 288 Mich App at 220-221.  It therefore cannot be said that the trial court abused its discretion in admitting Black's testimony.

Defendant also argues that the testimony of Shelly Ovink should have been excluded.  Ovink was called by the prosecution as an expert witness in psychology to testify on the subject of domestic violence.  Ovink, however, did not offer testimony of previous domestic violence by defendant, and in fact admitted that she did not know defendant.  Because there is no indication that her testimony was admitted under MCL 768.27b, nor did defendant object to her testimony at trial, this contention is without merit.

[2] At the hearing on the motion in limine, defense counsel essentially admitted that the arson was an offense involving domestic violence.

*Zintman*, 2018 WL 3551381, at *9-10.

The extraordinary remedy of habeas corpus lies only for a violation of the

Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502

U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under

state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  Petitioner has not met this difficult standard.

To the extent Petitioner argues that the state court improperly interpreted Mich. Comp. Laws § 768.27b, his claim is not cognizable on habeas review.  The Supreme Court and the Sixth Circuit repeatedly have recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)); *Johnson*, 559 U.S. at 138 ("We are, however, bound by the

Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

Moreover, there exists no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75.  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

Because there was no constitutional violation in the admission of evidence (bad acts), the state court decision was "far from" an unreasonable determination of the facts in light of the evidence presented.  *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *Bugh*, 329 F.3d at 512.  Accordingly, Petitioner is not entitled to relief on his second habeas ground, because his claim is either noncognizable or without merit.

C.     **Ground III:  Ineffective Assistance of Counsel**

In his third ground for habeas relief, Petitioner argues that his trial attorney was ineffective in failing to be aware of Mich. Comp. Laws § 763.8, which requires the audiovisual recording of custodial interrogations, and Mich. Comp. Laws § 763.9, which provides a penalty

22

for not recording such interrogations—that the jury be instructed that it may consider the absence of a recording in evaluating the evidence about an individual's statement.[1]

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*,

---

[1] In the state appellate courts, Petitioner, in his pro per supplemental brief, raised two additional claims of ineffective assistance of counsel: that his trial attorneys were ineffective in failing to have the clothing he wore on the night of the fire tested to prove that he was in the bedroom, rather than in the kitchen, that night; and that his trial attorneys failed to allow him to review the police report and pictures of the crime scene. Petitioner does not raise these additional claims in his habeas petition.

556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals thoroughly discussed and rejected Petitioner's claim of ineffective assistance of counsel:

> The effective assistance of counsel is presumed, and criminal defendants have a heavy burden of proving otherwise.  *People v Schrauben*, 314 Mich App 181, 190; 886 NW2d 173 (2016).  To demonstrate ineffective assistance of counsel, the defendant must prove that "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different."  [*People v.* ]*Solloway*, 316 Mich App 174, 188[; 891 NW2d 255, 266 (2016)] (citation omitted).  Here, defendant's claim of ineffective assistance arises from defense counsel's failure to request a jury instruction advising the jury that the police failed to record defendant's fourth interview as required by statute.  Defendant contends that he was in custody at the time of the fourth interview, and that therefore the police were required to audiovisually record the interview.

> MCL 763.8 requires audiovisual recording of custodial interrogations.  When law enforcement fails to record a custodial interrogation, MCL 763.9 provides, in relevant part:

>> . . . [t]he jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement.

> MCL 763.7(a) defines "custodial detention" as "an individual's being in a place of detention because a law enforcement official has told the individual that he or she is under arrest or because the individual, under the totality of the circumstances, reasonably could believe that he or she is under a law enforcement official's control and is not free to leave."  In this case, the testimony at the *Ginther* hearing indicates

that defendant was not in "custodial detention" at the time of the fourth interview. After talking to Sergeant Lafave twice on the morning of the fire, and then again in an interview at the police station, defendant agreed to undergo a polygraph test. On the day of the polygraph test,[3] defendant signed a *Miranda*[4] waiver form and a polygraph waiver form stating that he had the right to refuse the test. Defendant testified that the rights on the waiver forms were explained to him by Detective MacMaster. Defendant testified that when he was read his Miranda rights, he believed that he could not leave, but also testified that no one told him that he had to stay at the interview and he was not told that he was under arrest. Defendant was not handcuffed. He testified that "what I was doing was volunteering my time into trying to get this procedure taken care of" and that he wanted to take the polygraph test "to clear himself." After the interview, the police drove defendant home and defendant was not arrested until approximately two months later.

Defendant suggests that another factor influencing whether he believed he was free to leave was his physical condition as an alcoholic. At the *Ginther* hearing, Dr. John Lehtinen testified regarding the symptoms of withdrawal from alcohol, which he testified include extreme agitation, paranoia, seizures, and hallucinations. He also testified that a person experiencing alcohol withdrawal might experience increased heart rate, elevated blood pressure, and sweating that would be very observable to others. Withdrawal symptoms might also include less observable reactions such as tremors, mild agitations, and headaches.

A review of the record indicates that the trial court correctly concluded that defendant was not in custodial detention at the time he made the incriminating statements. The trial court considered the totality of the circumstances surrounding the fourth interview, including that defendant agreed to the polygraph, willingly accepted transportation to and from the interview by police officers, and acknowledged that he had been advised of his rights before the interview, including the right to halt the examination at any time. Defendant was therefore not entitled to a jury instruction regarding the fact that the fourth interview was not recorded, and defense counsel cannot be said to have been ineffective for failing to request the instruction.

[3] On the day originally set for the polygraph examination, the transporting officer arrived at defendant's home, but defendant acknowledged that he had been drinking. The exam was rescheduled and defendant cooperated by refraining from alcohol on that day. The fact that this interview took place essentially by appointment belies the contention that defendant was in custodial detention.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*Zintman*, 2018 WL 3551381, at *11-12. Although the court of appeals cited only Michigan cases, those cases expressly drew their standard of review from *Strickland*. *See Shrauben*, 886 N.W.2d

at 178 (citing *Strickland*); *Solloway*, 891 N.W.2d at 266 (same).  The court of appeals therefore applied the correct Supreme Court precedent.

Petitioner argues that his trial attorneys were ineffective for failing to request a jury instruction under Mich. Comp. Laws § 763.9, because his statement made during a custodial interrogation was not recorded.  Petitioner's argument turns on whether he was in "custodial detention," as defined by Mich. Comp. Laws § 763.7(a), at the time he made his statement. Reviewing the totality of the circumstances, as required by the statute, the court of appeals concluded that Petitioner was not in custodial detention at the time he made his statement.  As a result, the court found Petitioner was not entitled to the instruction described in Mich. Comp. Laws § 763.9.

As this Court earlier discussed, a federal court on habeas review may not re-examine state-law determinations on state-law questions.  *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.  The decision of the state court on a state-law issue is binding on a federal habeas court. *See Johnson*, 559 U.S. at 138; *Wainwright*, 464 U.S. at 84.

Because the court of appeals conclusively held that Petitioner was not in custody at the time he made his statement and therefore was not entitled to the instruction under state law, any request for the instruction by his attorney would have been futile.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."); *Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).  In other words, even if Petitioner's defense attorneys unreasonably failed to be aware of Mich. Comp. Laws § 763.8 and § 763.9, their lack of

awareness could not have prejudiced Petitioner.  The state court's rejection of Petitioner's claim of ineffective assistance of counsel therefore constituted an entirely reasonable application of *Strickland*.

## IV.  Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial

of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:  April 27, 2020                          /s/ Janet T. Neff
                                                                Janet T. Neff
                                                                United States District Judge

28